

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00143-CR

JENNIFER LOPEZ                                                        APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM 211TH DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. F-2014-0433-C

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Jennifer Lopez appeals her conviction for possession of a controlled substance by fraud. *See* Tex. Health & Safety Code Ann. § 481.129(a)(5)(A) (West Supp. 2015). In a single issue, Lopez argues that the evidence is insufficient to support her conviction. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL BACKGROUND

Loan Nguyen, a pharmacist at a Tom Thumb Pharmacy in Lewisville, received a prescription form that caught her attention because it was for a high dosage and a large quantity of a controlled substance and was for a patient who had not previously filled prescriptions at that pharmacy. The prescription had been faxed in by the Primary Care Clinic of North Texas and was for a patient named Adrian Martinez for ninety pills of two-milligram Xanax.[2] According to Nguyen, a new patient usually starts at .25 milligrams or .5 milligrams. Due to the red flags raised by the prescription, Nguyen called the clinic to confirm that the prescription was legitimate.

Ana Godinez, a medical assistant at the Primary Care Clinic of North Texas in Lewisville, testified that when the Tom Thumb Pharmacy called to verify the prescription, she could not locate in the clinic's files or on the clinic's computer system a patient by the name of Adrian Martinez with the date of birth given by the pharmacist. Godinez asked Lopez, who worked with her at the clinic, if she recalled a patient by the name of Adrian Martinez; Lopez said that Dr. Ruby John had asked her to fax in the prescription because Martinez was someone Dr. John knew personally from outside the clinic. Godinez asked the pharmacist to fax a copy of the prescription in question, and when it arrived,

---

[2]The prescription was for Alprazolam, which is more commonly known as Xanax.

2

Godinez knew that the handwriting in the signature belonged to Lopez.[3] Godinez took a picture of the prescription with her phone and sent the picture to Dr. John to see if she could verify that what Lopez had said was true.

Godinez left the prescription on the desk and exited the room; when she returned, the prescription was gone and so was Lopez. When Lopez came back to the office to retrieve her make-up bag, Godinez asked her what had happened to the prescription, and Lopez said that she had thrown it away.

Godinez called the pharmacy and asked them to fax another copy of the prescription to the clinic; upon receiving it, she told the pharmacist not to fill it. Godinez called the clinic's manager to tell her what had happened, and Godinez hid the second fax of the prescription in the office.

Dr. John reviewed the signature on the prescription in question and confirmed that it was not her signature and that no one had authority to sign her name to a prescription. Dr. John recognized the "J" in the signature on the prescription as Lopez's handwriting. Dr. John notified the office manager about the forged prescription.

The clinic's office manager and a board member met with Lopez the following day. When the clinic's office manager and the board member confronted Lopez about the prescription, Lopez was initially silent and then

---

[3]Godinez testified that, depending on the drug, medical assistants could fill out the identifying information for the patient, the drug, and the amount but that only the doctor could sign the prescription.

3

denied having written or sent the prescription. They called Dr. John into the manager's office where they were meeting, and Dr. John said that the signature on the prescription was not hers. After Dr. John left the room, the office manager and the board member again asked Lopez about the prescription. After sitting unresponsive for a few minutes, Lopez said, "I was only trying to help," but Lopez did not clarify whom she was trying to help. The officer manager and the board member gave Lopez two options: resign or be fired. Lopez chose to resign.

Officer Laura Smith with the Lewisville Police Department obtained written statements from Dr. John and the clinic's office manager. Detective Asa Hinson interviewed Lopez at her home and recorded his conversation with her, which was played for the jury. During the interview, Detective Hinson asked Lopez whether this was an ongoing deal, and she said, "It was just a one-time incident." Detective Hinson ultimately obtained an arrest warrant, and Lopez voluntarily turned herself in.

Lopez took the stand at trial and testified that sometimes the doctor signed a blank prescription sheet. Lopez said that the patient listed on the prescription was a patient at the clinic and that his parent was also a patient at the clinic. Lopez said that in this instance, either the patient called in to request a refill or it was in the chart. She testified that she filled out the prescription for Adrian Martinez and that Dr. John signed the prescription. Lopez recalled faxing the prescription in question.

4

Lopez testified that during the meeting with the clinic's office manager and the board member, she started crying and did not say much because "they were just like coming at [her] with a lot of questions, like they already -- they assumed that [she] knew this patient from outside or something." After she resigned, she realized that she had made a mistake regarding the patient's name. Lopez said that during the meeting with the clinic's office manager and the board member, she thought they were asking her about the name on the prescription; she did not understand that they were talking about a potential forgery. Lopez testified that she felt it was fair for her to resign instead of being fired.

Lopez explained that when she was asked during the interview with Detective Hinson whether this was a one-time incident, her affirmative response did not mean that she was forging prescriptions for someone who was not a patient of the clinic; she meant that it was a one-time mistake that she had made on the patient's name. Lopez said that she did not fill out the prescription as a favor for someone, that she was not friends with anyone named Adrian Martinez, and that she did not have an arrangement with someone by that name to obtain Xanax.

On cross-examination, Lopez testified that a patient did not call in requesting a refill and that she did not recall reading about the prescription refill in a patient's file. Lopez testified that she did not tell Godinez that she had thrown away the first copy of the prescription that was faxed over by the Tom

5

Thumb Pharmacy; it just mysteriously disappeared. Lopez said that before going into the meeting, she knew there was an issue with a forged prescription.

On redirect, Lopez testified that her understanding of why she was given the option to resign or be fired was that she had made a mistake on the patient's name. Lopez said that no one ever asked her whether she had signed someone else's signature. Lopez explained that when she said that she was doing a favor, she meant that she was helping because she was a medical assistant and was doing her job at the clinic.

After hearing the evidence above, the jury found Lopez guilty of possession of a controlled substance by fraud as alleged in the indictment. After hearing evidence during the punishment phase, the jury assessed Lopez's punishment at eight years' confinement, found that she had never been convicted of a felony, and recommended probation. The trial court sentenced Lopez to eight years' confinement, suspended the sentence, and placed her on five years' community supervision. Lopez perfected this appeal.

### III. SUFFICIENT EVIDENCE SUPPORTS CONVICTION

In her sole issue, Lopez argues that the evidence is insufficient to support her conviction.[4] Lopez does not challenge a specific issue or element of the offense of possession of a controlled substance by fraud.

---

[4]The indictment charged that Lopez "on or about the 5th day of August, 2013 . . . did then and there knowingly possess, obtain, attempt to possess or obtain a controlled substance, namely, alprazolam, by misrepresentation, fraud,

6

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

A person commits the offense of possession of a controlled substance by fraud if she knowingly possesses, obtains, or attempts to possess or obtain a controlled substance or an increased quantity of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge. Tex. Health & Safety Code Ann. § 481.129(a)(5)(A).

Here, the evidence demonstrates that Lopez, a medical assistant at a clinic, faxed to the Tom Thumb Pharmacy a fraudulent prescription for ninety pills of two-milligram Xanax. The pharmacist was suspicious of the prescription because it was written for a high dosage—two milligrams instead of .25 or .5 milligrams—and a large quantity of a controlled substance for a patient who had not previously filled prescriptions at that pharmacy. The pharmacist called the

forgery, deception[,] or subterfuge, to-wit: by using a fraudulent prescription that purported to be authorized by Doctor Ruby John."

7

clinic to verify that the prescription was legitimate and was ultimately told not to fill the prescription because the clinic could not locate in its files a patient named Adrian Martinez with the same birthdate as the one listed on the prescription. Godinez testified that although Lopez told her that Dr. John had authorized her to fax the prescription, the signature on the prescription looked like it was Lopez's handwriting; Dr. John testified that she did not sign the prescription and that the "J" in the signature on the prescription looked like Lopez's handwriting. Moreover, after the copy of the prescription disappeared, Godinez questioned Lopez, who said that she had thrown it away. When the clinic's office manager and a board member met with Lopez to question her about the fraudulent prescription, she said that she was only trying to help. Lopez told Detective Hinson that this was a one-time occurrence. The jury could have reasonably inferred—from the absence of any records at the clinic bearing the name of "Adrian Martinez" and having the date of birth shown on the prescription, from the testimony regarding the signature, and from Lopez's behavior following the incident—that Lopez had attempted to obtain or possess Xanax by forging Dr. John's signature on the prescription and faxing it to the Tom Thumb Pharmacy.

In her appellate brief, Lopez "recognizes that it was the jury's prerogative to weigh the evidence and accept or reject any testimony of the witnesses" but argues that the jury should have found the evidence insufficient. We may not, however, re-evaluate the weight and credibility of the evidence and substitute our

8

judgment for that of the factfinder. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict, we hold that the evidence is sufficient to prove beyond a reasonable doubt that Lopez knowingly attempted to possess or obtain a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, to-wit: by using a fraudulent prescription that purported to be authorized by Doctor Ruby John. *See Beaty v. State*, 156 S.W.3d 905, 910 (Tex. App.—Beaumont 2005, no pet.) (holding evidence sufficient for jury to infer that appellant presented the "Laura Green" prescription to the Wal-Mart pharmacy with full knowledge that the prescription was not the act of the doctor whose signature was on it); *see also Greer v. State*, No. 02-09-00087-CR, 2010 WL 2813404, at *2 (Tex. App.—Fort Worth July 15, 2010, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to prove that appellant knowingly possessed or attempted to possess a controlled substance because appellant presented a fraudulent prescription for 120 pills of Lortab at Walgreen's and did not return to pick up prescription after pharmacist said prescription would have to be verified); *Economy v. State*, No. 01-97-00404-CR, 1999 WL 34702, at *2–3 (Tex. App.—Houston [1st Dist.] Jan. 28, 1999, pet. ref'd) (not designated for publication) (holding evidence sufficient to support conviction for possession of a controlled substance through the use of a fraudulent telephonic prescription). We overrule Lopez's sole issue.

## IV. Conclusion

Having overruled Lopez's sole issue, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 23, 2015