

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00110-CR
No. 02-23-00111-CR

_____

MANUEL MATA, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 6
Tarrant County, Texas
Trial Court Nos. 1736671, 1736673

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Manuel Mata of resisting arrest, search, or transportation (resisting transportation) and of interference with public duties and assessed his punishment in each case at 180 days in jail and a $2,000 fine. In two issues,[1] Mata argues that the evidence is insufficient to support his convictions. Because the record, which includes body-cam footage, supports Mata's convictions, we affirm both judgments.

## II. Background

### A. Facts Related to the Interference-with-Public-Duties Conviction

Officer Jose Palomares with the Fort Worth Police Department (FWPD) testified that on the date in question he was off duty[2] but was working in uniform to provide security for Community Crossroads on Hemphill Street in Fort Worth. Officer Palomares explained that Community Crossroads is an outreach center that provides formula, diapers, groceries, and clothing to people in need. Officer

---

[1]Mata filed two briefs—one for each of his convictions—and incorrectly used No. 02-23-00110-CR to refer to the appeal from his conviction for interference with public duties when the appeal for that conviction was filed in No. 02-23-00111-CR and vice versa for his conviction for resisting transportation. The State responded by filing a single brief that addresses both sufficiency challenges. For purposes of this opinion, we will use the order of the appellate case numbers and will treat the challenge to Mata's conviction for resisting transportation as his first issue and the challenge to his conviction for interference with public duties as his second issue.

[2]Officer Palomares was later asked, "As a police officer, you are always on duty, right?" He answered, "Yes, sir."

Palomares described the area around Community Crossroads, noting that there was a Boys and Girls Club, a high school for pregnant teens, and Tarrant County MHMR for youth. He explained that Community Crossroads often has people show up high on drugs and that this is of particular concern because of the women and children who come to the center and because of the youth who attend or visit the nearby club, high school, and MHMR.

On the morning in question, a man came inside Community Crossroads and told Officer Palomares that he was afraid to go outside because he had been threatened by an alleged drug dealer named Jay Fennell.[3] The male explained that Fennell wanted to beat him up and that Fennell had drugs on him at that moment. Officer Palomares went outside and spoke to Fennell and captured the interaction on his body-cam video.

Officer Palomares asked the man who was seated beside Fennell to move to another location and told Fennell to sit on the ground against the wall; both complied. Officer Palomares was concerned that Fennell had drugs on him and received Fennell's permission to search him, but Fennell did not allow a search of his backpack or his cooler. While Officer Palomares was conducting his investigation, a backup officer arrived. Multiple people walked past the scene during the investigation, but none of them interfered with the investigation.

---

[3]The spelling used for the suspect's last name in the reporter's record is Finnel, which differs from the spelling that Officer Palomares copied from the suspect's driver's license. We use the spelling obtained by the officer.

Officer Palomares left the backup officer with Fennell and went back inside the center to speak to the man who had reported that Fennell had threatened him. It took a moment to find the man as numerous people were inside the center. After Officer Palomares found him and started taking down his information, a woman came up and told Officer Palomares that Fennell possibly had a fake weapon with him. Officer Palomares returned outside to where Fennell was and called for a drug dog.

Approximately fifty minutes into Officer Palomares's investigation, Mata approached the scene on a scooter. Mata initially rode past the officers but then turned around and came back toward them. Officer Palomares's body-cam video shows that he told Mata,

> Do me a favor for your safety -- for your safety hang -- hang tight over there for me or on the other side. Do you understand what I'm telling you? Sir, we've got a guy with drugs here, sir. Sir, you cannot be in this spot. You can record over there.[4]

Instead of moving away, Mata rode his scooter up "[v]ery close" to Officer Palomares, retrieved his phone (which was attached to a tripod), and placed it very near Officer Palomares's body camera. Mata stayed put and repeatedly asked for Officer Palomares's name and badge number. Officer Palomares warned Mata that he would be arrested for interfering. Mata eventually parked his scooter several feet away while stating that it would be illegal for Officer Palomares to arrest him. Officer Palomares repeatedly told Mata that he had already asked him to move and that he

---

[4]Officer Palomares testified that FWPD has a policy that anyone can film or take pictures of police officers.

needed to move away. Mata took a few steps forward toward Officer Palomares. Officer Palomares ultimately handcuffed Mata and had to escort him to the ground because he refused multiple commands to sit down. Throughout this time and while they waited for additional officers to transport him, Mata cursed at Officer Palomares and yelled that the arrest was illegal.

Officer Palomares testified that Mata inserted himself into the investigation with Fennell and that, as a result, he had to turn his back on Fennell—an action that Officer Palomares described as being very dangerous for him—in order to deal with Mata. Officer Palomares confirmed that Mata had interrupted, disrupted, impeded, or interfered with his investigation because he had prevented Officer Palomares from keeping an eye on Fennell.

On cross-examination, Officer Palomares agreed that Mata had eventually moved away, that Mata had taken about two steps forward toward the scene, and that even then he was farther away from Fennell than a lady who was sitting on a concrete abutment. Officer Palomares testified that there had been briefing regarding Mata, so he was aware of who he was and that he filmed officers.

## B. Facts Related to the Resisting-Transportation Conviction

Officer Jake Smith with FWPD testified that when he and his training officer (Officer Stroemer)[5] arrived on the scene, Mata was sitting on the ground in handcuffs.

---

[5]The officer's name is misspelled in the reporter's record; the correct spelling is reflected on the officer's badge in Officer Palomares's body-cam video.

Officer Smith, with his body camera recording, helped Mata to a standing position and took him to the police vehicle so that he could be transported. While Officer Smith was trying to get Mata from the ground to the vehicle, Mata was very agitated; he repeatedly said, "Call your supervisor"; complained that his hands hurt;[6] and cursed. Officer Smith said that he "had to walk with a purpose" to get Mata to the vehicle because he was afraid that Mata would run off. As Officer Smith tried to get Mata into the vehicle, "[t]here definitely was, like, some resistance [he] could feel," but at that point, he was not resisting arrest or transportation. Mata did say, "I'm not going to cooperate."

As Officer Smith assisted Mata with getting into the police vehicle, Mata continued to curse. Officer Smith testified that as he

> started to close the door, [Mata] positioned himself in a way that stopped [Officer Smith] from being able to. He physically used force with his feet to hold the door. And . . . when [Officer Smith] first went to shut the door, [he] had to stop [him]self because [he] didn't want to hurt [Mata] with the door because he had pushed his feet and/or [was] using his feet and knee area to push the door open[]. [Officer Smith] had to open the door again and physically grab [Mata's] legs and put them in the vehicle before [he] could secure the door.

Officer Smith explained that he could feel the pressure from Mata's knee/shin area pushing against the door, and that pressure stopped Officer Smith from being able to

---

[6]Because Mata complained about the handcuffs, one of the arresting officers and an EMS paramedic checked them. They found no issues.

shut the door.[7] During this time, Mata stated, "I'm resisting your illegal arrest." Officer Smith was questioned specifically regarding whether Mata had resisted transportation:

> Q. When you were trying to . . . arrange for transportation, did [Mata] prevent you from doing that?
>
> A. Yes, sir. He prevented and made it much more difficult, but we were eventually able to get him in the vehicle and transport him.
>
> Q. Did he obstruct you from furthering that arrest and transport?
>
> A. Yes, sir.
>
> Q. How did he do that?
>
> A. By the way he put himself in that doorway and held the door open with his feet. And, obviously, having . . . multiple attempts to get him inside the patrol vehicle. It just made everything even longer, the whole circumstances.
>
> Q. When you put him back in the car the second time, did he resist again?
>
> A. Not the same way he did the first time. He still tried to get his body in the way, but then he moved[,] and we were able to shut the door.
>
> Q. And Officer Stro[e]mer was with you trying to further that arrest and affect that transportation; is that correct?
>
> A. That is correct.
>
> Q. So he was trying to resist your efforts; is that correct?
>
> A. That is correct.

---

[7]Officer Smith said that he had to close the door to contain Mata, to lower the threat level to others in the area, and to transport him to jail.

Q. And Officer Stro[e]mer's efforts?

A. That's correct.

Q. On an arrest that Officer Palomares initially made?

A. That is correct.

## C. Disposition

After hearing the testimony and watching the officers' body-cam videos, which were admitted into evidence, the jury found Mata guilty of both charges. The jury assessed Mata's punishment in each case at 180 days' confinement and a $2,000 fine. The trial court sentenced Mata in accordance with the jury's assessment.

## III. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute

our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

## IV. Sufficient Evidence Supports Resisting-Transportation Conviction

In his first issue, Mata challenges the sufficiency of the evidence to support his conviction for resisting transportation. Specifically, Mata argues that he applied force against the door, not against Officer Smith; thus, Mata contends that there is no evidence that he directed force at or in opposition to Officer Smith. As explained below, the door was not an impenetrable barrier that precluded Officer Smith from detecting the force that Mata directed at or in opposition to Officer Smith as he attempted to close the door so that he could transport Mata to jail.

Texas Penal Code Section 38.03 sets forth the offense of resisting transportation:

> (a) A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or

9

transportation of the actor or another by using force *against the peace officer* or another.

(b) It is no defense to prosecution under this section that the arrest or search was unlawful.

Tex. Penal Code Ann. § 38.03(a)–(b) (emphasis added). The Court of Criminal Appeals has defined "against" in Section 38.03(a) as "in opposition or hostility to"; "contrary to"; "directly opposite"; "in the direction of and into contact with"; or "in a direction opposite to the motion or course of." *Dobbs v. State*, 434 S.W.3d 166, 171 (Tex. Crim. App. 2014) (quoting Merriam-Webster's Collegiate Dictionary 21 (10th ed. 1996)). In essence, "using force against the peace officer or another" means "violence or physical aggression, or an immediate threat thereof, in the direction of and/or into contact with, or in opposition or hostility to, a peace officer or another." *Id.*

Here, the information charged that Mata used "force against said peace officer, namely by using force to keep his leg outside of a patrol vehicle or by using force to push his leg outside of a patrol vehicle." On appeal, Mata does not deny using force but rather focuses solely on whether there is any evidence to show that the force that he used was against the peace officer.

Mata attempts to analogize his actions to those in *Dobbs*. As summarized in a later opinion by the Court of Criminal Appeals,

> In *Dobbs*, the defendant held a gun to his own head and threatened to take his own life. Dobbs never pointed or threatened the officers with the gun. He did not use force against the officers—only against himself

10

to prevent the arrest. As such, [the Court of Criminal Appeals] held that Dobbs's use of force did not constitute resisting arrest because he ultimately did not use force against the officers.

*Finley v. State*, 484 S.W.3d 926, 928 (Tex. Crim. App. 2016) (footnote omitted). The facts in *Dobbs* are distinguishable from the facts here.

Officer Smith testified to the ways that Mata opposed being transported to the jail. The officers were unable to depart for the jail after putting Mata in the patrol vehicle because Mata resisted having the door closed; Mata "physically used force with his feet to hold the door" and used his "feet and knee area to push the door open[]." Mata's action was "in opposition or hostility to" Officer Smith's attempts to close the door and necessitated Officer Smith's "physically grab[bing Mata's] legs and put[ting] them in the vehicle before [Officer Smith] could secure the door." Although Mata's legs did not make direct contact with Officer Smith, Mata did exhibit "violence or physical aggression[] . . . in the direction of and . . . in opposition or hostility to[] a peace officer" when he used his legs to prevent the officer from closing the patrol vehicle's door. *See Dobbs*, 434 S.W.3d at 171. Mata's actions thus met the *Dobbs* definition of "using force against the peace officer"—the challenged element of his resisting-transportation conviction. *Cf. Thompson v. State*, No. 09-96-022 CR, 1998 WL 428862, at *2 (Tex. App.—Beaumont 1998) (not designated for publication) (holding that appellant's continued forceful resistance of officer's attempts to transport appellant constituted "using force against the officer" because appellant "had to have been exerting force *against* [the officer]—even if those exertions amounted only to

digging in his heels and refusing to move"), *pet. ref'd*, 987 S.W.2d 64 (Tex. Crim. App. 1999).

At the end of his argument, Mata references the discomfort and pain that he experienced while in handcuffs and contends that "[i]t is possible he was applying force to the door as a way to deal with his pain." Broadly construing his argument, it appears that he is attempting to negate the intent element. Mata's argument fails because he ignores that he specifically stated his intent: "I'm resisting your illegal arrest." *See generally Martin v. State*, No. 09-19-00458-CR, 2022 WL 551140, at *2 (Tex. App.—Beaumont Feb. 23, 2022, no pet.) (mem. op., not designated for publication) (stating in sufficiency analysis of resisting-arrest conviction that "[j]uries may infer intent from circumstantial evidence, such as the accused's acts, words, and conduct"). And though it would have been more accurate to have said that he was resisting transport, the intent is still clear from the words that he used, and he demonstrated that intent by using his leg to prevent the officer from closing the door. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Braughton*, 569 S.W.3d at 608; *Queeman*, 520 S.W.3d at 622 (requiring appellate court to view the evidence in the light most favorable to the verdict and to presume that the factfinder resolved conflicting inferences in favor of the verdict).

Based on the record, there is sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that Mata had used force against the

peace officers as they attempted to transport him. Accordingly, we overrule Mata's first issue.

## V. Sufficient Evidence Supports Interference-with-Public-Duties Conviction

In his second issue, Mata challenges the sufficiency of the evidence to support his conviction for interference with public duties. Within his second issue, Mata raises a myriad of arguments, none of which wins the day.

To establish the misdemeanor offense of interference with public duties, the State must prove that the defendant, acting with criminal negligence, interrupts, disrupts, impedes, or otherwise interferes with a peace officer "while the peace officer is performing a duty or exercising authority imposed or granted by law[.]" Tex. Penal Code Ann. § 38.15(a)(1), (b). Refusing to leave the scene when instructed to do so and distracting an officer from performing his duty constitute interference under Section 38.15. *See Hernandez v. State*, No. 07-22-00042-CR, 2022 WL 15334312, at *2 (Tex. App.—Amarillo Oct. 26, 2022, no pet.) (mem. op., not designated for publication); *Russell v. State*, No. 02-20-00024-CR, 2022 WL 1043129, at *4 (Tex. App.—Fort Worth Apr. 7, 2022, pet. ref'd) (mem. op., not designated for publication). However, "[i]t is a defense to prosecution under [Section 38.15] that the interruption, disruption, impediment, or interference alleged consisted of speech only." Tex. Penal Code Ann. § 38.15(d).

The misdemeanor information charged that Mata—acting with criminal negligence—interrupted, disrupted, impeded, or interfered with Officer Palomares, "a

13

peace officer who was performing a duty or exercising authority imposed or granted by law, namely conducting a criminal investigation, by approaching [Officer] Palomares and being belligerent in a manner that cause[d Officer] Palomares to stop what he was doing and to engage with [Mata]." The jury charge instructed the jury that if they found that Mata had committed the offense of interference with public duties as alleged in the information and if they further found, or had a reasonable doubt, that the interruption, disruption, impediment, or interference alleged consisted of speech only, then they should find him not guilty.

In his initial argument, Mata argues that Officer Palomares "was acting as an off-duty security guard" whose "duty was to provide security, not to investigate drug offenses." To the extent that Mata's argument can be read as challenging whether Officer Palomares was a peace officer because he was off duty, Mata failed to object to the jury charge, which instructed the jury that "J. Palomares is a peace officer." With regard to Officer Palomares's duties, Mata contends that it was not within Officer Palomares's purview to investigate possible narcotics activities because he had called for a narcotics officer with a drug dog to come to the scene. Mata's argument, however, ignores that a peace officer has a duty to prevent an offense within his presence or view. *See* Tex. Code Crim. Proc. Ann. art. 6.06 ("Whenever, in the presence of a peace officer, or within his view, one person is about to commit an offense against the person or property of another, . . . it is his duty to prevent it . . . ."). Moreover, on its face, investigating information about a potential crime—

14

that a man, who is an alleged drug dealer and who is onsite with a possible weapon, has threatened to assault another man—would normally fall within the duties of an officer who stated that his role was "to provide safety[ and] security" in order to maintain the safety and security of all those who were in and around the center. Thus, Officer Palomares was "performing a duty or exercising authority imposed or granted by law." *See generally* Tex. Penal Code Ann. § 38.15(a)(1).

Mata further argues that Officer Palomares was not conducting an investigation at the time that Mata approached the center because Officer Palomares had called for a narcotics officer to investigate. Mata cites to no authority for his contention, and the facts belie it. Officer Palomares was the officer who received the tip as to Fennell and took the lead in the investigation; Officer Palomares stated during the incident that he had reasonable suspicion to believe that Fennell had drugs and possibly a gun. Fennell, however, would not permit Officer Palomares to search his backpack or his cooler, so Officer Palomares called for a drug dog. Officer Palomares was detaining Fennell and was awaiting the arrival of the drug dog when Mata approached; thus, the evidence reflects that the investigation was still in progress.[8] And because of that, the

---

[8]Officer Palomares was questioned about the investigation as follows:

Q. Okay. So when you are dealing with this individual, possible drugs, possible weapons?

A. Yes.

15

record reflects that Officer Palomares and the backup officer sought to maintain an implied perimeter around Fennell by asking those who lingered nearby to move.

Mata argues, alternatively, that even if Officer Palomares were deemed to have been conducting an investigation at the time that Mata arrived, Officer Palomares failed to articulate to the jury how Mata had interfered with the investigation. Mata

---

Q. What is the next logical step you want to do during this investigation?

A. So now what I have done at that time is I have got a hold of a narcotics supervisor and asked --

Q. Let me stop you right there. Did you want to search him?

A. Yes, I do.

Q. Did he allow you to search him?

A. No, he did not.

Q. Did he just give you a carte blanche, no, you can't look at any of my stuff o[r] piece it out, you can look at some stuff, not the other?

A. So when I asked him if I can search him, he said, ["]No, you can check me, but you cannot check my backpack or the cooler on my bike[," which was] next to him.

Q. During this time, were you conducting an investigation?

A. Yes, sir.

Q. Were you a peace officer performing a duty or exercising authority imposed or granted by law?

A. Yes, sir.

recognizes that Officer Palomares testified that Mata had come "within feet of him and [had] asked for his name and badge number" but makes no mention that Officer Palomares had instructed him multiple times to move to another location away from the area where Fennell was being detained. Mata ignored repeated instructions and came back towards Officer Palomares while shouting and being belligerent.[9] Due to Mata's belligerent behavior, which was directed at Officer Palomares, Officer Palomares had to take his attention off Fennell and deal with Mata.

Mata next argues that the backup officer "was present and [was] able to maintain control and supervision over [Fennell, who] was seated, compliant, and not moving." It is not for us to judge how many officers are necessary to detain a person who is suspected of possessing drugs and possibly a weapon. We therefore do not see how this argument helps Mata's sufficiency challenge.

Mata also contends that "[w]hat cannot be ignored is [FWPD's] previous interactions with [Mata]." Mata notes that FWPD had briefings with its officers

_____

[9]Mata's brief includes a list of various actions that he never did—such as stepping in Officer Palomares's way, trying to speak with Fennell, etc. The list of actions he did not take does not overshadow the fact that he did "com[e] back towards" Officer Palomares despite numerous instructions to move away. Mata also states in his brief that "another citizen unrelated to the supposed investigation was actually closer in proximity to [Officer] Palomares than [Mata] during this interaction that was deemed 'interference' [on his part]." The video reflects that an elderly woman sat on the corner, that she obeyed when Officer Palomares told her not to communicate with Fennell, and that she moved when Officer Palomares instructed her to do so. Moreover, as explained below, Mata's offense was not solely his proximity to the detention area but rather his conduct while in close proximity to the area where officers were detaining Fennell.

17

discussing his filming activities and argues that is "why it only took [Officer] Palomares about a minute and a half to make the decision to arrest [Mata]." Although Officer Palomares mentioned at trial that he was familiar with Mata due to the department's briefings, on the video, he said, "I think I know who this guy is"; he later said that he had heard of him before but that he had never run into him before. But on the date in question, it was not Officer Palomares's recognition of Mata but rather Mata's refusal to obey Officer Palomares's repeated instructions—to move away from the area—that led to Mata's arrest.

Mata's brief references the fact that Fennell was ultimately released despite having methamphetamine in his possession that day.[10] Mata implies that the offense of interference with public duties requires the interfered-with investigation to produce an arrest. The elements of the offense are listed above, and no such element exists. Thus, the outcome of Fennell's investigation in no way alters the outcome here in which there is sufficient evidence that Mata interrupted, disrupted, impeded, or interfered with a criminal investigation that Officer Palomares was conducting when Mata arrived.

Mata's final argument is that he "merely used words and did nothing to physically interfere with an investigation." Mata's attempt to fit within the defense to

_____

[10]On the body-cam footage, the narcotics officer explained that they had found a personal-use amount of methamphetamine but that they believed Fennell had information about some dealers in the area, so they wanted to transport him to another location to gather information from him and then planned to release him.

an interference-with-public-duties offense fails because the video reflects that he physically interfered: he put his camera very near Officer Palomares, moved a few feet away, and then came back towards Officer Palomares a second time, thus disobeying Officer Palomares's multiple commands to move to the other sidewalk to film.

Here, the jury had both Officer Palomares's testimony, as well as his body-cam footage, from which to discern whether Mata had interfered with public duties as alleged in the indictment. Examining the aforementioned evidence in the light most favorable to the jury's verdict, we conclude that the jury could have determined beyond a reasonable doubt that Mata—by his actions—interrupted, disrupted, impeded, or otherwise interfered with Officer Palomares's criminal investigation of Fennell. *See Lovett v. State*, 523 S.W.3d 342, 345–46, 353 (Tex. App.—Fort Worth June 15, 2017, pet. ref'd) (holding evidence sufficient to support interference-with-public-duties conviction when appellant failed to disarm after being instructed to do so by officers who were providing security for other officers who were nearby performing a traffic stop); *Poole v. State*, No. 12-06-00290-CR, 2007 WL 2782746, at *1, *3 (Tex. App.—Tyler Sept. 26, 2007, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support interference-with-public-duties conviction when officer, who was stationed in front of a residence where a search warrant was being executed, told appellant to continue on to another residence or to leave the scene, appellant cursed at the officer and told him that he would go where

19

he wanted to go, and then appellant aggressively started moving toward another officer); *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd) (holding evidence sufficient to support interference-with-public-duties conviction when appellant repeatedly stepped off the sidewalk after officers told him to remain on the sidewalk). Accordingly, we overrule Mata's second issue.

## VI. Conclusion

Having overruled Mata's two issues, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 14, 2023